488 July 2, 2025 No. 576

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of E. J. R.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

E. J. R.,
*Appellant.*

Yamhill County Circuit Court
22JU02662; A181622

Ladd J. Wiles, Judge.

Submitted February 18, 2025.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sara F. Werboff, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patricia G. Rincon, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

EGAN, J.

Vacated and remanded for written findings under ORS 419C.478(1).

**EGAN, J.**

Youth appeals a judgment committing him to the Oregon Youth Authority (OYA) with a recommendation for placement in a youth correctional facility (YCF). He raises four assignments of error. In the first and second assignments, youth argues that the juvenile court plainly erred when it did not strike vouching testimony by a nurse examiner. In the third assignment, youth argues that the juvenile court failed to make sufficient written findings under ORS 419C.478(1) describing why it is in youth's best interests to be committed to the legal custody of OYA. In his fourth assignment, youth argues that the juvenile court erred in recommending that he be placed in a YCF because that recommendation was based on a misunderstanding of the juvenile court's authority. We reject youth's first and second assignments because the nurse's statements do not unambiguously constitute vouching. We also reject youth's fourth assignment because we do not understand the juvenile court to have misunderstood its authority. However, as to the third assignment of error, we agree with youth that the written findings do not satisfy ORS 419C.478(1). Accordingly, we vacate and remand for written findings under ORS 419C.478(1).

## I.   BACKGROUND

A full recitation of the facts is not necessary to understand the specific issues on appeal. In June 2022, the state filed a petition alleging youth was within the juvenile court's jurisdiction for acts that, if committed by an adult, would constitute two counts of first-degree rape, ORS 163.375, and two counts of first-degree sexual abuse, ORS 163.427. All four counts involved the same victim, T, and the same episode. Youth denied the allegations and proceeded to a contested jurisdictional hearing.

At the hearing, the state introduced testimony from nurse Theodore, who had examined T. During direct examination, the state asked Theodore, "And when [T] came in, do you recall what her demeanor was like when you met up with her?" Theodore responded, "Yes, she was *** very shy, scared, you know, kind of just embarrassed,

if I—I mean, I had to say, like just didn't want us looking at her, didn't want us asking questions, and I've seen that multiple times in these exams, so she was reacting in a way that most patients would." The state then proceeded to ask, "[W]ould you say her demeanor stayed the same throughout?" Theodore responded, "For the most part—" to which the state followed up with "This time you were with her?" Theodore explained, "—[Y]ou know, [T] just wanted to go home, made that very clear, and we do try to work as quickly and as efficiently as possible to get them out of that situation because it is traumatizing to be not at home after having something so awful happen to you."

The state also questioned Neumann from the Juvenile Department about the department's recommendation for youth. Neumann responded that "[i]t is the juvenile department's recommendation that [youth] be committed to the Oregon Youth Authority for placement at a youth correctional facility[.]" [] Youth also questioned Neumann about the availability of community placement through OYA. Youth argued for placement in the community and did not want placement in a YCF.

The court found youth to be within the juvenile court's jurisdiction for conduct that, if committed by an adult, would constitute one count of first-degree rape and one count of first-degree sexual abuse. As for the disposition, the court explained that youth needed structure and that the court would follow the juvenile department's recommendation to commit youth to OYA's legal custody for placement in a YCF. The court stated:

"So at least at this point with the evidence that's been presented to me, I do follow the recommendation to commit you to the youth authority. The youth authority will—I think has to start with a youth correctional facility for placement, though, and correct me if I'm wrong, [Juvenile Department representative], I think that if there's the right responsivity by you and the analysis from the evaluations that are coming back in a certain way that they could consider you for placement in something other than, say, as your attorney [argued], MacLaren, but there's other places that you might be able to go that could provide you the level of structure that will help you ***."

The court entered an order and judgment committing youth to the legal custody of OYA for placement in a YCF for a period not to exceed 20 years, with credit for time served, and with the period not extending beyond the date on which youth reaches 25 years of age. The court's written findings included:

> "[I]t is in the best interest and welfare of the youth that he be placed in legal custody of the Oregon Youth Authority, State of Oregon, for placement in a youth correctional facility. There is no less restrictive placement that will assure the youth will conform his conduct to the law and other conditions that may be imposed to protect the best interest of the youth or community."

Youth appeals the juvenile court's judgment and disposition, raising four assignments of error that reduce to three legal issues, which we address in turn.

## II.  DISCUSSION

### A.  *Vouching*

We begin with the issue of whether the challenged testimony constituted vouching. Youth challenges two of Theodore's statements, claiming that her testimony "was tantamount to a statement that the nurse believed the complainant had been sexually assaulted" and therefore constitutes impermissible vouching evidence. First, youth argues that the juvenile court plainly erred when it permitted Theodore's testimony that T "was reacting the way most patients would" during a sexual assault examination. Second, he argues that the juvenile court erred in permitting Theodore to testify that it was "traumatizing" to not be at home after "having something so awful happen to you." Youth's arguments are unpreserved, but he asserts that it was plain error for the trial court not to strike the statements as vouching. The state argues that Theodore's testimony is not unambiguous vouching because she did not comment directly on T's truthfulness or credibility but rather made statements regarding T's demeanor. We conclude that Theodore's statements were, at most, ambiguous and therefore do not warrant correction on plain error review.

We review issues of vouching for legal error. *State v. Sperou*, 365 Or 121, 139, 422 P3d 581 (2019). "'Vouching' refers to the expression of one's personal opinion about the credibility of a witness." *Id.* at 128 (citation omitted). "[T]he rule against vouching prohibits a witness from making a direct comment, or one that is tantamount to a direct comment, on another witness's credibility." *State v. Murphy*, 319 Or App 330, 335, 510 P3d 269 (2022) (quoting *State v. Black*, 364 Or 579, 585, 437 P3d 1121 (2019)).

Whether a statement constitutes vouching "depends on the context in which it arose and the context of how it was offered at trial." *State v. Wellington*, 332 Or App 44, 54, 548 P3d 146, *rev den*, 373 Or 81 (2024). The key inquiry is "whether the testimony at issue directly expressed an opinion on the truth of another witness's statement or merely tended to show that another witness either is or is not telling the truth." *Alne v. Nooth*, 288 Or App 307, 314, 406 P3d 109 (2017). Testimony that is "solely descriptive of the manner in which a communication is made—so called demeanor evidence—is permissible and not a comment on a witness's credibility." *State v. Pergande*, 270 Or App 280, 283, 348 P3d 245 (2015) (quoting *State v. Wilson*, 266 Or app 481, 490, 337 P3d 990 (2014), *rev den*, 356 Or 837 (2015)).

"When faced with an unpreserved claim of error regarding vouching, our first task is to assess the challenged testimony to determine whether the witness unambiguously vouched, may or may not have vouched (ambiguous), or unambiguously did not vouch." *Murphy*, 319 Or App at 335. "If a witness unambiguously vouched, it is plain error not to have stricken the testimony, even absent an objection." *Id.* "Conversely, if a witness's testimony was ambiguous—such that the witness may or may not have been vouching—there is no plain error in not having stricken the testimony *sua sponte*, in part because the lack of objection prevented clarification of the testimony." *Id.* Finally, "if the witness unambiguously did not vouch, obviously there is no error, plain or otherwise, in not striking the testimony as vouching." *Id.* at 336. In this case, neither of Theodore's challenged statements unambiguously constituted vouching.

In the first challenged statement, Theodore testified that T was

> "very shy, scared, you know, kind of just embarrassed, if I—I mean, I had to say, like just didn't want us looking at her, didn't want us asking questions, and I've seen that multiple times in these exams, so she was reacting in a way that most patients would."

Youth argues that that statement constituted vouching because it equated T's reaction with that of the many abuse victims that Theodore has seen—thereby expressing Theodore's belief that T was genuinely a victim of abuse. However, Theodore's description of T's demeanor and its similarity to that of other patients did not unambiguously express Theodore's opinion that T was a credible witness.

In general, "testimony about the physical appearance of a speaker" and demeanor evidence is not vouching evidence. *State v. Miller*, 327 Or App 740, 748, 537 P3d 191, *rev den*, 371 Or 715 (2023); *see also State v. Lupoli*, 348 Or 346, 362, 234 P3d 117 (2010) ("[O]bservations of [the complainant's] physical characteristics and demeanor ordinarily would not be, in and of themselves, impermissible vouching."). In context, Theodore's description could be understood as comparing T's demeanor with that of a victim of sexual abuse or it could just as readily be understood as comparing T's demeanor to that of any patient undergoing the type of invasive exam that Theodore was conducting. Theodore's statement was therefore ambiguous, and the juvenile court did not plainly err in failing to intervene. *See Wellington*, 332 Or App at 55 (concluding that the "challenged testimony was not unambiguously vouching and that the legal point, therefore, is not obvious and is reasonably in dispute" and therefore the error is not plain).

Similarly, Theodore's second challenged statement—that T "just wanted to go home," followed by the explanation that "we do try to work as quickly and as efficiently as possible to get them out of that situation because it is traumatizing to not be at home after having something so awful happen to you"—is also not unambiguous vouching. Although it is possible, as defendant argues, that it could be understood to imply that T wanted to go home because something awful

had happened to her, that is not the only reasonable under-standing of the testimony. The state's question, "This time you were with her?" together with Theodore's response, "we do try to work as quickly and as efficiently as possible to get them out of that situation because it is traumatizing to be not at home after having something so awful happen to you" could be understood as Theodore explaining generally why, when she performs sexual assault examinations, she tries "to work as quickly and as efficiently as possible"—"to get them out of that situation" to minimize their trauma. Theodore's use of "them" could be understood as a reference the type of patients that she usually sees as opposed to T specifically. Although the explanation followed her observa-tion that T wanted to go home, it does not *necessarily* imply that something awful had happened to T and that was the reason that T wanted to go home. Like the first, the second statement is ambiguous. Therefore, the two statements at issue are not unambiguously vouching statements that war-rant correction on plain error review. Accordingly, the trial court did not plainly err in failing to strike the challenged statements by Theodore.

## B.   *Juvenile Court's Discretionary Authority*

We turn next to youth's argument that the juve-nile court erred because it failed to recognize that it had discretion in recommending placement in a YCF. *See* ORS 419C.495(1) ("An adjudicated youth placed in the legal cus-tody of the Oregon Youth Authority may be placed in a youth correction facility *** only when the juvenile court having jurisdiction so recommends[.]"). That argument is premised youth's understanding of the juvenile court's statement, "I think [youth] has to start with a youth correctional facility." He contends that his advocacy for placement in a custodial community program implicitly informed the juvenile court that it had discretion not to recommend placement in a YCF and, thereby preserved his claim of error. In the alterna-tive, he requests plain error review. The state argues that the issue is unpreserved and does not warrant plain error review.

We need not decide whether youth preserved his argument, because we do not understand the juvenile court's

statement to which youth objects to reflect a misunderstanding of the applicable legal framework. As explained above, the state recommended that youth be committed to the custody of OYA for placement in a YCF. The court explained why it was persuaded to follow that recommendation, and then stated, "I do follow the recommendation to commit you to the youth authority." We understand that to mean that the court was persuaded both to commit youth to OYA custody and to recommend placement in a YCF. Immediately after that, the court stated, "I think [youth] has to start with a youth correctional facility." We disagree with youth that that statement represents a misunderstanding of the court's discretionary authority to permit placement in a YCF. Viewed in context, the statement simply explains the practical results of the court's acceptance of the state's recommendation to permit placement in a YCF. The juvenile court did not misunderstand its discretionary authority.

C.   *Written Findings*

Finally, we address whether the juvenile court's written findings satisfy ORS 419C.478(1). Youth argues that ORS 419C.478(1) requires the juvenile court to make written findings explaining why commitment to the legal custody of OYA is in the youth's best interest and that, here, the juvenile court's findings were insufficient. The state responds that the juvenile court did sufficiently explain why commitment to OYA was in youth's best interest. We review the sufficiency of the juvenile court's written findings pursuant to ORS 419C.478(1) for legal error. *State v. D. B. O.*, 325 Or App 746, 748, 529 P3d 1004 (2023). We agree with youth that the juvenile court's explanation here does not reflect the careful and explicit evaluation that is required under ORS 419C.478(1).

As a preliminary matter, the argument is not preserved, but "youth is excused from preservation requirements because he had no opportunity to object before the judgment and commitment order were issued." *Id*. at 747-48.

ORS 419C.478(1) authorizes the juvenile court to "place an adjudicated youth who is at least 12 years of age in the legal custody of [OYA] for care, placement, and

supervision" but requires that, as part of any order doing so, the court "'shall include written findings describing why it is in the best interests of the adjudicated youth to be placed with [OYA].'" *State v. E. S.*, 333 Or App 350, 351, 552 P3d 754 (2024) (quoting ORS 419C.478(1)). "[W]ritten findings required by ORS 419.478(1) 'are necessary even when evidence supports the juvenile court's disposition.'" *Id.* (quoting *D. B. O.*, 325 Or App at 748). "Regardless of community safety or other practical considerations leading to the youth's commitment, such as a probation violation, the mandate explicitly requires the findings to describe *why* it is in the *youth's* 'best interests' to be committed to OYA." *D. B. O.*, 325 Or App at 748 (emphasis in original). "[T]he legislature imposed the findings requirement to ensure that the juvenile court takes time to consider the positive and negative impacts a decision may have on the adjudicated youth." *Id.* at 750.

Our prior case law on this issue informs our analysis. In *D. B. O.*, we vacated and remanded the juvenile court's decision to commit an adjudicated youth to OYA custody because the court's written finding that the youth "[could not] be maintained in the community" was too ambiguous. *Id.* at 750-51. We held that the finding did not satisfy ORS 419C.478(1) because it failed to explain why placement in OYA was in the youth's best interest and most likely to lead to a positive outcome for the youth. *Id.* at 749-50. "While [the finding] could perhaps lead to an explanation, 'it is not an explanation itself' concerning what is best for the youth." *Id.* at 749-50 (quoting *State v. S. D. M.*, 318 Or App 418, 421, 506 P3d 1190 (2022)).

Similarly, in *E. S.*, we vacated and remanded the juvenile court's decision to commit a youth to OYA for placement in a YCF for the same reasons stated in *D. B. O. E. S.*, 333 Or App at 354. The court's written findings were made on a form containing a single line for best-interest findings, which we noted was "not well suited to making thoughtful written findings." *Id.* at 352. As for the substance of the findings, we explained that "the juvenile court must direct its written findings to the specific issue of why it is in a youth's best interest to be placed with OYA." *Id.* at 354. We further explained,

"Findings that are ambiguous as to whether they are directed to the youth's best interest—versus being directed to what is in the best interests of the community, what is in the best interests of other individuals, what is administratively convenient, what is justifiable punishment for a probation violation, or the like—will not survive appellate review and will result in a remand for additional findings."

*Id.*

The legislature expressed its intent that the juvenile court carefully evaluate its decision to place youth in OYA custody and consider the positive and negative impacts such a decision may have on an adjudicated youth and to articulate its reasoning and conclusion in written form. *D. B. O.*, 333 Or App 749-50 (citing *State v. S. D. M.*, 318 Or App at 420, which explains that legislatively required written best-interest findings are meant to ensure that a juvenile court's decision is most likely to lead to a positive outcome for the child). "In other words, by imposing the findings requirement, the legislature created a process that requires juvenile courts to carefully and thoroughly consider any factor favoring or counseling against the commitment to OYA custody." *State v. N. K. H.*, 341 Or App 78, 81, ___ P3d ___ (2025). "That process is designed to protect a child's interests and to safeguard against conclusory approaches to a decision that has the power to fundamentally alter a childhood." *Id.*

Here, the juvenile court committed youth to OYA and recommended placement in a YCF. It explained that "[t]here is no less restrictive placement that will assure the youth will conform his conduct to the law and other conditions that may be imposed to protect the best interests of the youth or community." Like the written findings in *D. B. O.* and *E. S.*, that statement is ambiguous as to whether it reflects consideration of youth's best interest or the best interest of the community. In particular, by referring to youth's inability to conform to conditions "imposed to protect the best interests of the *** community," the finding fails to focus, as the legislature has required, on *youth's* best interest.

Further, the statement is too conclusory to satisfy the ORS 419C.478(1) requirement of an "explanation of why it would be in the best interests of youth to be committed to a custodial setting rather than to remain with family or in the community." *D. B. O.*, 325 Or App at 749. The legislature has tasked the juvenile court not just with stating that the decision to place the child in custody is in the child's best interest, but with "describ[ing] *why*" the choice to place the child in the custody of OYA is in the best interest of that particular child. ORS 419C.478(1) (emphasis added). To "describe why" that choice is in the child's best interest, the juvenile court should identify its factual findings regarding the child's needs, in particular, the needs that are driving the court's decision to place the child in OYA custody and any needs that may cut against the placement; explain how placing the child in OYA custody will serve those needs; and consider the downsides of OYA custody for the particular child.[1] Written findings that simply state there are no other options for a child do not demonstrate the careful evaluation that the legislature contemplated to ensure that a juvenile court's decision is most likely to lead to a positive outcome for the child. Accordingly, we vacate and remand for additional written findings under ORS 419C.478(1).

## III.   CONCLUSION

In sum, the juvenile court did not err in failing to *sua sponte* strike Theodore's testimony because her statements were not unambiguous vouching. Additionally, we disagree with youth that the juvenile court was mistaken about its discretionary authority in recommending placement in a YCF. However, the juvenile court did err in failing to provide sufficient written findings pursuant to ORS 419C.478(1).

Vacated and remanded for written findings under ORS 419C.478(1).

---

[1] As noted above, a juvenile court may commit a youth to the custody of OYA but not permit placement in a YCF. However, when, as in this case, OYA custody and YCF placement go hand in hand—with the result that, as in this case, the court understands that the youth will initially be placed in a YCF—the court's best-interest analysis will necessarily take into consideration the youth's placement in a YCF.